## In Equity.

### OAKLAND WOOLEN COMPANY et al.

### *vs.*

### UNION GAS AND ELECTRIC COMPANY et al.

### Kennebec.    Opinion February 22, 1906.

*Waters and Water Courses.    Equity Jurisdiction.    Grant of Water Power.    Rights*
*of Grantor and Grantee.    Rights of Riparian Owners.    Construction of*
*Grant of Water Power.    Prescriptive Rights.    Reasonable*
*Detention of Water.    Dam Owners.*
*Upper and Lower Dams.*

1.  A court in equity has jurisdiction to determine the respective rights of the owners of water power developed by a dam.

2.  When the owner of a dam and water privilege grants a part of the water power thereby developed, the right of the grantee is superior, to the extent of the grant, to that of the grantor. Thereafter the grantor has no right to interfere with the grant, or to diminish the quantity of water which has been granted. Nor have those holding under the grantor any such right. The rights of the owner of the dam are thereafter subject to the grant.

3.  But if the grantee is not using, or has no wish or preparation to use the water, the grantor or those holding under him may use the whole or allow it to flow down stream.

4.  All grants of water power are subject to the rights of riparian proprietors below to have the natural flow of the stream transmitted to them, after reasonable use or detention.

5.  A grant of the right to take water from a flume or dam "for carrying on every branch of the tannery business" is not a grant of an indefinite quantity of water, but only of such quantity as would develop the power necessary to carry on every branch of the tanning business, either as it existed at the time of the conveyance, or was then contemplated by the parties. And their conduct afterwards, the use by one and the acquiescence by the other, would furnish satisfactory evidence of what was in contemplation by them.

6.  When a grant is made by a dam owner, of the right to draw water from a flume or dam for the purpose of creating the power required for specified purposes, and the grant is silent as to the head of water to be maintained,

and there is no evidence of explanatory conditions affecting the grant, it should be held that a definite head was intended, and that it was the head customarily and ordinarily used at the time of the grant. The grantee becomes entitled to water at that head, sufficient to produce the power required.

7. When the amount of water in an ancient grant was measured by the power required at its date, and there now remains no evidence of the power then required, the continued, unvarying use by the grantee for a long period of time, acquiesced in by those in the line of title of the grantors, will furnish very satisfactory evidence of the extent of the original grant, both as to head and quantity.

8. A grant by the owner of a dam of the right to use 500 square inches of water, for the purpose of creating power, as a substitute for a prior grant, in which the head was not mentioned, carried by implication the right to draw the water from the dam, at the head at which water was ordinarily taken under the prior grant.

9. A grant of a lot "together with one divided third part of the mill dam across said stream, with the right to take and use one third part of the water therein running after deducting the right of water to grind bark and full hides" formerly granted, was not also subject to a deduction of water used by a grist mill, on the ground that the grist mill lot was excepted from the conveyance.

10. In cases of doubt, the practical construction given by the parties is sometimes of great consequence in ascertaining the intentions which should be attributed to them by the language used or omitted in their grants. But such interpretation is never admissible to throw down language which is definite and certain, nor when it would be in violation of settled rules of construction.

11. Unless a use of water for power is in excess of right, and is continuous for twenty years, and is adverse, and is shown to have occasioned actionable injury, no prescriptive right arises. No such prescription is shown in this case.

12. The reasonableness of the detention of running water by dams by the riparian proprietor above to the injury of the riparian proprietors below depends much upon the nature and size of the stream as well as the use to which it is subservient. A use of water followed by detention which would be reasonable in a pond that would fill in a night time might not be reasonable in a case where it would take weeks or months to fill the pond. The owner of the dam controlling the water must not only see existing conditions, but he must foresee probable consequences. He must not, either by use or sluicing, lower the water in the dam, so that in order to perform his duty to those below, and give them the natural flow at all times, he must deprive the grantees on his own dam of the water to which they are entitled. He must keep up the head so that they can exercise their rights, and, then, the surplus of water, either natural or accumulated, which they are not entitled to, or do not use, he may use or turn down stream.

13.  Where upper proprietors had the right, under grants from the owner of a dam, to use water for operating a grist mill and a woolen mill, they had the right to use the grants in the usual manner, returning the water to the stream without unnecessary loss or detention, although a riparian proprietor below, which was also the owner of the dam, was a public service corporation, charged with the performance of public duties.

14.  Under a grant of the use of water, unlimited as to the number of hours' use the grantee may use the water as many hours in the day as he pleases.

15.  Under the grants and upon the evidence in this case, *Held:* that the plaintiff, Oakland Woolen Company, is entitled to the use of 500 square inches of water, or water which would pass through an orifice having a superficial area of 500 square inches, under the grants of the tannery privilege; and under the grants of the wood shop privilege, to the use of six square feet of water, or nine square feet when the water runs over the dam, but not exceeding the quantity granted in 1849, which was one third of the water running in the stream, subject to the right of the tannery privilege, both of these uses being under the usual heads at the times of the grants. The plaintiff, Oakland Water Company, is entitled to the privilege to draw water for the grist mill, subject to the tannery grant of 1879, but limited to the use of no greater quantity of water for the tannery privilege than was required by the grant of 1823. The measure of right under the grist mill grant of 1836 is considered to be the present ordinary use of the grist mill, with the present wheels, under the usual working head of water as it was usually kept before this controversy arose. All the grants are unlimited as to the number of hours they may be used in the day.

16.  For their damages the plaintiffs will be remitted to their remedy at law. *Gray* v. *Water Power Company*, 85 Maine, 526, distinguished.

In equity. On report. Case remanded for further proceedings in accordance with the opinion.

Bill in equity praying for a determination of the respective rights of the owners of a water power developed by the Coombs Mills dam on the Messalonskee stream in Oakland, Kennebec county, and for an injunction. Heard at the October term, 1904, of the Supreme Judicial Court, Kennebec county. At the conclusion of the evidence the case by agreement was reported to the Law Court, "such decree to be entered therein as the law and the evidence require."

The case appears in the opinion.

*Wm. T. Haines and Harvey D. Eaton,* for plaintiffs.

*Charles F. Johnson and G. K. Boutelle,* for defendants.

SITTING: WISWELL, C. J., EMERY, WHITEHOUSE, SAVAGE, POWERS, SPEAR, JJ.

SAVAGE, J.    Bill in equity praying for a determination of the respective rights of the owners of water power developed by the Coombs Mills dam on the Messalonskee stream in Oakland, and for an injunction.    Messalonskee stream is the outlet of Snow pond, a pond with an area of about four and one half square miles.    Prior to 1823, Jonathan Coombs owned the land on both sides of the stream and erected a dam across it, at a distance from the foot of the pond proper of nearly a quarter of a mile.    A dam of substantially the same height as the original one has ever since been maintained and still stands at the same point.    The dam ponds the water back on the entire surface of Snow pond, so that when the water is drawn below the top of the dam, it takes sometimes weeks and sometimes months for the pond to fill again.

In 1823 Jonathan Coombs conveyed to William S. Stanley a lot of land below the dam above mentioned, bounded by the Messalonskee stream on one side, "together with the privilege of taking water from the flume of the grist mill if it does not injure the speed of the grist mill; but if it does then to be taken from the dam sufficient for carrying on every branch of the tanning business; but for no other purposes or machinery whatever."    For convenience, we will call this the tannery privilege.    In 1879 the owners of the dam conveyed to one Parker, then owning the above mentioned lot and the tannery privilege, "the right and privilege to use for any and all purposes five hundred inches of water that the said Parker now has the right to take or draw from the upper stone dam," which was the Coombs Mills dam,  .  .  .  "for the purpose of carrying on the tannery business; provided that he, the said Parker, and his heirs and assigns, shall hereafter contribute his or their share or proportion with others in keeping said dam in repair in proportion to the quantity of water he or they use, meaning and intending to convey to said Parker the right to use five hundred inches of water for all purposes, while he has heretofore had the right to use said water for one particular purpose only."    In 1902, the Oakland

Woolen Company, one of the plaintiffs, succeeded in title to the land and water rights which had belonged to Parker.

In the meantime, in 1836, the parties then owning the dam had conveyed to one Thomas land on the same side of the Messalonskee stream as the tannery privilege, but nearer the dam, " with the privilege to draw water for a grist mill from the dam or canal on conditions that the said Thomas shall build and maintain a part of a dam and canal in proportion to the water that may be wanted for the said grist mill." It appears that upon this lot a grist mill was standing, with a flume connected with the dam, at the time Coombs conveyed the tannery privilege in 1823. In 1898 this land and privilege was conveyed to the Oakland Water Company, the other plaintiff. This privilege is called the grist mill privilege. The Union Gas and Electric Company in its answer denies that the Oakland Water Company acquired title to the grist mill lot and privilege. Of this we will speak hereafter, simply saying now that the foregoing statement is correct, according to the terms of the deed.

In 1849, the parties then owning the dam conveyed to David Coombs a lot of land on the Messalonskee stream, being all the land between the tannery lot and the grist mill lot, " together with one undivided third part of the mill dam across said stream with the right to take and use one third part of the water therein running after deducting the right of water to grind bark and full hides for the tannery originally sold to William S. Stanley." This we call the wood shop privilege. In 1854 the parties who owned this lot and privilege conveyed the lot to one Butterfield, " with the right to draw six square feet of water from the canal now on the above described premises, and nine feet when there is a surplus water running over the dam ; said Butterfield to keep said canal in good repair." Since that time the lot has been the subject of many conveyances, none of which mentions the dam specifically, but every one of which contains in the habendum clause the words, " with all the privileges and appurtenances thereunto belonging," or " with all the privileges and appurtenances thereof." Whenever the water right is specifically mentioned in the later deeds, it is described as it was in the deed to Butterfield in 1854. By the last of these

conveyances, this lot and privilege was conveyed to the Oakland Water Company in 1898, at the same time and by the same deed the grist mill lot and privilege was conveyed to it. In 1902, the wood shop lot and privilege were leased by the Oakland Water Company to the Oakland Woolen Company for the term of ninety-nine years. So that so far as the present determination of rights is concerned, the Oakland Woolen Company may be regarded as the owner of both the tannery lot and privilege and the wood shop lot and privilege. By the terms of the lease, the lessee agreed to furnish power from the wheel on the leased premises for running the lessor's pump, and has since connected a line of shafting from the wheel to the lessor's pumping station for that purpose, and the same is now in use.

Since its purchase in 1902, the Oakland Woolen Company has expended a large amount of money in erecting a woolen mill on the tannery and wood shop lots, and in equipping the same with machinery. It has, as it claims, further developed the water power upon those privileges by installing new and improved and more economic water wheels. And it is now carrying on there the business of woolen manufacturing.

The defendant corporation, the Union Gas and Electric Company, is the only one of the defendants whose rights we shall need to consider, as the defendant Spaulding's only rights, except as riparian proprietor below, he holds under and by virtue of a contract with the other defendant. And by the term defendant hereafter we shall refer only to the corporation.

The defendant is the owner by mesne conveyances from Jonathan Coombs of all the dam and water rights at the Coombs Mills dam which have not been conveyed to others by the deeds above referred to. It owns a shop or mill at the south end of the dam, equipped to be run by water power from the dam. It also owns a shop called the Batchelder chair shop, run by water power from the opposite end of the dam, above the grist mill privilege. It also owns and controls the outlets of a chain of ponds above Snow pond, so as to be able to utilize the water therein for storage or reservoir purposes. There are in the Messalonskee stream below the Coombs Mills dam several developed water privileges, and at Waterville, six or seven miles dis-

tant, the defendant owns and operates an electric light and power station. Taken as a whole, it seems to be a case at present where there is more enterprise than water.

While for many years, with the uses for water power which then existed, the proprietors at the dam in question, and on the stream below, enjoyed their privileges without serious trouble or complaint, and perhaps without any careful determination of their respective rights, in very recent years, by new development of uses, and as well by a development of new uses for water power, particularly, so far as concerns this case, by the plaintiff, the Oakland Woolen Company at its mill, and by the defendant at its power station in Waterville, the parties have come into very sharp collision as to their rights. And to adjust those rights they have properly come into a court of equity. *Warren* v. *Westbrook Mfg. Co.*, 88 Maine, 58.

The plaintiffs claim that the dam in question is a power dam, as distinguished from a reservoir dam, that it was erected and has always been maintained to create power for the use of the various mills connected with it, and that lately the defendant has used it as a reservoir dam, and, by drawing off the water within it by a sluice and otherwise, so that it might flow down and be used for the more convenient operation of its power plant below, has at times lowered the head of water at the dam more than it had any legal right to lower it, and so low in fact as to destroy its efficiency for the creation of power upon the plaintiffs' wheels. And it is alleged that by this conduct the Oakland Woolen Company has lost the use of the water power belonging to it, and has been put to great expense in supplying itself with power otherwise, and it is claimed that damages therefor should be recovered in this proceeding.

On the other hand the defendant claims that the lowering of the head of water and the other conditions complained of in 1903, prior to the bringing of this bill, were due to the unusual drouth of that year, and to the Oakland Woolen Company's use of water in excess of its rights, and not to the sluicing of water by it, and that afterwards it sluiced water through the dam only to let down the natural flow of the stream, together with the stored waters which had been accumulated in the reservoir ponds above. It says further that in

1904, it did not sluice any water until after the woolen company had ceased to use its wheels for manufacturing purposes. This, however, was after the bringing of this bill.

It is evident that the plaintiffs' rights, whatever they are, are superior to those of the defendant, as owner in the dam and the land with which the dam is connected. The several rights of the plaintiff were carved out by the owners, one after another, from the more extensive rights which they owned, and only the remainder has come down to the defendant. Jonathan Coombs owned the whole. He sold the tannery privilege. His grantee thereby acquired the first right to the extent of that grant. The successors in title of Jonathan Coombs granted the other privileges, thereby in each instance diminishing the right of the grantors. And thereafter neither the grantors, nor those holding under them, had any right to interfere with these grants, nor to diminish the quantity of water which had been granted. *Stickney* v. *Munroe,* 44 Maine, 195. The defendant's rights as dam owner are subject to those grants. It cannot use or sluice water in diminution of the grants, if the grantees wish and are prepared to use it. But if the grantees are not using, or have no wish or preparation to use the water, the grantor or those holding under him may use the whole or allow it to flow down stream. *Warren* v. *Westbrook Mfg. Co.* 88 Maine, 58; *Pratt* v. *Lamson,* 2 Allen, 275. Flowing water is not subject to ownership. Grantees of water rights have merely the right to use it as it flows. They must use it then or not at all. All the rights, however, both of grantors and grantees, are subject to the rights of riparian proprietors below to have the natural flow of the stream transmitted to them, after reasonable use or detention.

1. The deed of the tannery privilege in 1823 conveyed the right of taking water from the flume of the gristmill then standing, or from the dam in a certain contingency not important here, "for carrying on every branch of the tanning business," but for no other purpose. Although this grant was modified and limited in 1879, it is important, considering one phase of the case, to construe this original grant. It does not appear that a tannery was then standing on the lot conveyed by the deed of 1823, but it is evident that one was standing,

or was contemplated. The use of the water was expressly limited, but the amount of water was not limited in terms, though we think it was by implication. It was such a quantity of water as would develop the power necessary to carry on every branch of the tanning business, either as it existed at the time of the conveyance, or was then contemplated by the parties. And their conduct afterwards, the use by one and the acquiescence of the other, would furnish "swift evidence" of what was in contemplation by them. *Butler* v. *Huse*, 63 Maine, 447. Such we think was the intention of the parties, which, so far as expressed in the deed, and construed in the light of existing conditions, must control. The grantor was the owner of a saw mill run by water power from the same dam. As was said in *Covel* v. *Hart*, 56 Maine, 518, "it is evident that it is either a grant of all the water which may thereafter be found necessary to carry on the business of tanning in the yard, however extended and whatever new or additional machinery or vats or other works may be introduced and used, even if they should require all the water of the stream; or it must be limited to the quantity necessary to carry on the business of tanning as it had been carried on and was carried on at the time of the giving the deed." And the court added "it would be remarkable, if he (the grantor) had granted a right to an indefinite quantity of water which might be so exercised as to destroy the value of his mill and privilege." *Davis* v. *Muncey*, 38 Maine, 90; *Blake* v. *Madigan*, 65 Maine, 522.

Although the defendant here in argument says it does not resist a decree the effect of which will be to keep the water in the dam up to a "workable head," it does contend that as a matter of strict construction of this and the other deeds, it is not obliged to maintain the water up to the crest of the dam, as claimed by the plaintiffs, or to any other particular head. The deed itself was silent as to head. But it does not follow that for that reason the grantor left himself at liberty to lower the head to suit his own interests or pleasure. The use of the water was granted for the purpose of creating power. To create power a head is essential. The water was to be taken from the dam, or from a flume in which naturally the water would stand at the same level as in the dam. The purpose of the dam was to

create a head. The grantor having granted the tannery lot, with the right to draw water from the dam to be used for power purposes on the lot, could have no right to draw off or use the water and so lessen the head to the detriment of the grant he had made. *Stickney* v. *Munroe*, 44 Maine, 195; *Jordan* v. *Mayo*, 41 Maine, 552. It does not seem to us consistent with the purposes of the grant that the head was to be changeable or variable according to the will of the grantor. The grant of water for power by the owner of the dam implies that the water is to be kept at such head as is necessary for the enjoyment of the grant. *Rackley* v. *Sprague*, 17 Maine, 281. "The good sense of the doctrine on this subject is that under the grant of a thing, .whatever is parcel of it, or of the essence of it, or necessary to its beneficial use and enjoyment, or in common intendment is included in it, passes to the grantee." Story, J., in *Whitney* v. *Olney*, 3 Mason, 280. In this case, however, it does not mean necessarily that the water is to be kept as high as the crest of the dam, for that may not be necessary. As we have seen, the amount of power to be developed was fixed as of the time of the grant. That power could be produced with more water under less head, or with less water under more head. It rarely or never happens that the head is constant. The use itself of the water tends to change the head. Nevertheless we think the parties must have had some definite intention as to the head, and in the absence of qualifying limits in the grant, or of explanatory conditions at the time, we think it should be held that the head intended was the head customarily and ordinarily used at the time of the grant. When this is known, it is not difficult to ascertain the quantity of water under this head which will produce the power required. Now since there is no evidence of the amount of water granted as measured by the power required in 1823, as there is now neither witness nor record of that fact, the continued, unvarying use by the grantees, especially for a long period of time, acquiesced in by those in the line of title of the grantors, will furnish very satisfactory evidence of the extent of the original grant, both as to head and quantity.

But in 1879, the predecessors in title of the defendant granted to the plaintiff's predecessor in title, Parker, the right to use for any

and all purposes five hundred inches of water that the said Parker now has the right to take or draw from the upper or stone dam . . . for the purpose of carrying on the tanning business." No land was granted, although the grantors owned one third of the dam in common and undivided. Merely an incorporeal hereditament was granted, — the right to draw water. But we think that the grant must be construed in the light of conditions created by the previous grants. The grant was manifestly intended as a substitute ·for the previous grants of water, which it modified. It is a grant of the water which the "said Parker now has the right to take." But all restrictions on the use are removed, and the quantity is fixed at five hundred inches. The parties agree that this means five hundred square inches, or water which would pass through an orifice with a superficial area of five hundred square inches. Whether this quantity is greater or less than the original grant does not appear. At any rate, these figures measure the quantity of water to which the woolen company is now entitled by virtue of the grant of the tannery privilege. And though no part of the dam was granted, nor was the right to draw from the dam or flume expressly granted, there is no doubt but that right passed as appurtenant to the principal grant,— the right as then ordinarily used. *Whitney* v. *Olney*, supra.

Here again the parties are at issue concerning the head at which the woolen company is entitled to take its water. Since the area of the section of water as it passes from the dam or flume to the grantee is fixed, the head becomes all the more important. The defendant invokes the case of *Gray* v. *Water Power Company*, 85 Maine, 526. In that case there had been granted "the right of drawing as much water . . through my dam as will vent off through a gate or opening that is equal to ten inches square, . . . and to carry the water across my land situated between the dam and said Berry's (the grantees) shop by canal or otherwise, . . . or said Berry may at his election take the water out through the main dam and carry it down the brook, nearly to the bridge, by a flume or otherwise, and there erect a building twenty feet square for the convenience of his water wheel, . . . meaning to convey to said Berry the right of using as much water out of the pond as would pass through a

hole ten inches square after conveying it to a convenient place to
erect a water wheel." Nothing was said about a head. The grantee
made through the dam an opening of one hundred square inches,
the lower part of which was three feet above the bottom of the dam.
And the water thus drawn from the dam was conducted by a *canal
dug* by Berry to his wheel, which was set on about the same level as
the bottom of the dam thus obtaining three feet head after it left
the dam. It was held that the act of the successor in title to the
grantor in drawing down the water in the dam nearly to the top of
the opening of the dam, thereby diminishing the usual head of water
in the pond was not an infringement upon the right granted.

It will be observed that the grant was of an incorporeal right, and
of only an easement in the land for the purpose of conducting the
water to a contemplated wheel. It was not the grant of a millsite,
with water rights granted expressly or appurtenant. It was not a
grant in substitution of existing water rights, or to be construed in
connection with such rights. It was merely the grant of the right
to draw so much water. The court said that the decision of the
case depended upon the intention of the parties to the grant, (mean-
ing of course the intention as expressed) " taken in connection with
their situation and the subject matter of their transaction at the
time." In ascertaining that intention the court noticed that the
quantity of water was small ; that the part of the dam from which
the water was to be taken was not specified, there being an option
of two different places ; that no mention was made of any head
whatever ; that the size of the opening only was given ; that
" neither the dimensions of the mill to be built, nor the kind, extent
or purpose of the machinery to be attached thereto and operated by
this small quantity of water carried several rods from the dam in
a *canal*, is hinted at ;" and that nothing was said about Berry's
sharing the expense of keeping the dam in repair. All such matters,
of course, are proper for consideration when the language of the
grant is indefinite. But the court expressly recognized the rule that
the grant of a principal thing carries all things necessary to the use
and enjoyment of the thing granted which the grantor has the power
to convey, and, therefore, that the grant of mills carries by implica-

tion the use of the head of water necessary to their enjoyment owned by the grantor, citing *Blake* v. *Clark*, 6 Maine, 436 ; *Rackley* v. *Sprague*, 17 Maine, 281 ; and *Wyman* v. *Farrar*, 35 Maine, 70. And the court also cited with approval the case of *Canal Co.* v. *Hill*, 15 Wall, 49, where it was held that, although no head of water was mentioned in a lease of " so much water as would pass through an aperture of two hundred square inches to be used solely for propelling the machinery of a paper mill and appurtenant works," it was to be presumed that the parties contracted in reference to such a head as depended upon the usual depth or height of water in the canal.   This last case was distinguished by the court from the case then decided on the ground that in the former case the use to which the water was to be appropriated was specified in the lease.

We think the case now at bar is to be distinguished from the case of *Gray* v. *Water Power Co.*, supra.   Here the grant was made with reference to a water power then in actual use by the grantee, modifying and limiting it, to supply a mill and machinery then actually existing, and it was to be in substitution of a grant under which the grantee, as we have seen, was entitled to have such a head maintained as was necessary to the enjoyment of the grant.   Provision was made for paying a proportionate part of the expenses of repairs on the dam.   The production of power by the water granted was the object of the grant.   Since the ventage area was limited, to lower the head would tend to impair and might destroy the utility of the grant itself.   To imply that the grantor reserved such a right would, we think, be in violation of the manifest intention of the parties.   We think rather that it should be held, in the language of *Canal Co.* v. *Hill*, supra, that the parties contracted with reference to such a head as depended upon the usual depth or height of water in the dam.

2.   The next in order is the grant of the grist mill lot in 1836, "with the privilege to draw water for a grist mill."   This grant is subject to the tannery grant in 1823, and likewise we think to the substituted grant in 1879.   But as it does not appear whether the grant of 1879 calls for a larger quantity of water than that of 1823, it should be added that the grist mill grant is subject to the use

of no greater quantity of water for the tannery privilege than was required by the original grant.

We understand the defendant to claim that the plaintiff water company which now owns the grist mill and leases it to tenants at will is not authorized by its charter to engage in the grist mill business and draw water for it, and therefore that the right so far as the plaintiffs are concerned has lapsed. We do not think so. We think the case shows that this privilege was purchased by the water company in connection with the adjoining lot on which it proposed to use water power for pumping purposes, and that in one respect at least its proper corporate operations would be facilitated by acquiring the ownership of the grist mill property. Its use of this property should be regarded as incidental and not unlawful, and not subject to successful attack by the defendant.

As was true in the case of the tannery privilege, so here, the amount of water granted was indefinite in terms. To ascertain that amount reference must be had, as in the other case, to the conditions existing, or contemplated at the time of the grant. And in the absence of evidence specifically bearing upon that time, the conduct of the parties during all the years,—the use and the acquiescence,—must be resorted to. So far as we can judge from the case before us that use has not been materially changed, and the present ordinary use, with the present wheels, under the usual working head of water as it was usually kept before this controversy arose, must afford the measure of right under the grist mill grant. As that water power has always been used and is now being used for grist mill purposes, it is unnecessary to inquire now whether the use of that privilege is limited to grist mill purposes.

3. And next and last is the grant, in 1849, of what is called the wood shop lot "together with one undivided third part of the mill dam across said stream, with the right to take and use one third part of the water therein running after deducting the right of water to grind bark and full hides for the tannery originally sold (in 1823) to William S. Stanley." In this grant the quantity of water granted was expressly defined as one third of the water running in the stream. So far the language is controlling. But it is in terms subject to

the rights of the tannery privilege, meaning, of course, those rights as they existed in 1849. It is not subject to any greater rights, if any such were created as against the grantor, by the grant of 1879. But since the plaintiffs own both of these rights, and both are superior to the defendant's rights, it is unnecessary to consider this feature further. Following the rule already stated, the grant of one third of the dam, with the right to use one third of the water, implied that the usual head of water was to be maintained.

But the defendant contends that this grant was subject also to the deduction of the water used by the grist mill; that the grantee was entitled to the use of only one third of what water was left after satisfying both the tannery and grist mill grants. It appears by the 1849 deed, that after stating a grant of land with prescribed boundaries, and of the water privilege, subject to the tannery privilege, in the language we have quoted, the grantor used the following language:—"Excepting and reserving out of the last described parcel of land, Kimball & Mathews' store lot, Samuel Kimball's house lot, Alfred Winslow's tannery lot, and John Mathew's and S. H. Bailey's grist mill lot." The "tannery lot" and "grist mill lot" are the ones now in question. The defendant's claim is that construing the language of the exception more strongly against the grantor, it should be held that by excepting the grist mill lot from the conveyance the water privilege appurtenant to it was also excepted, and was thereby made an exception to be deducted from the water granted. We are not persuaded that this construction is allowable. It is evident that the excepted parcels were within the boundaries of the larger parcel first described. The tannery lot and the grist mill lot, we know, had previously been conveyed, and were not then owned by the grantor. It may have been so with the other excepted lots. At any rate, it is obvious that the purpose of the exception was to take entirely out of the grant in every respect the excepted parcels of land, so that the effect would be the same as if the granted land had first been so described as to exclude the excepted parcels, without any reference to them. The grantor particularly described the right of water granted as subject to the tannery right, and no

other.   There is nothing in the deed from which any other deduction can be implied.

It appears that in the later conveyances of the woodshop lot and privilege, the interest in the dam which was conveyed by the deed of 1849 has been omitted, and the water right has been described as the right "to draw six square feet of water from the canal now on the above described premises, and nine feet when there is a surplus water running over the dam." How this change of description came about does not appear. But it is not claimed that as against the defendant, these later grants enlarged the original right. They might lessen it. It is diminished so far as ownership in the dam itself is concerned. The present grantee is entitled to six square feet of water, and nine square feet when the water is running over the dam, but not in any event in excess of one third of the water in the stream, after deducting the tannery right. And appurtenant to this, as we think the case shows, is the right to take this water from the canal, as it has been taken, for many years at least. *Rackley* v. *Sprague*, supra; *Baker* v. *Bessey*, 73 Maine, 479.

The defendant contends that the results reached by us do not represent the intentions of the parties to the grants as shown by their conduct, by the practical construction put upon the grants by them. It is true that in cases of doubt, the practical construction given by the parties is sometimes of great consequence in ascertaining the intentions which should be attributed to them by the language used or omitted in their grants. But such interpretation is never admissible to throw down language which is definite and certain, nor when it would be in violation of settled rules of construction. The conditions upon which the defendant relies relate chiefly to the relative quantities of water which have heretofore been used by the respective parties, and not very much as to the head which has been maintained. The proportionate parts of the expense of repairing the dam, as borne by the several parties, is also relied upon. It is said that for a long period of years, those in the defendant's rights have used much more, and those in the plaintiffs' rights have used much less water than they would be entitled to under the construction we have placed upon the grants. Of course such long continued use, in the absence of any

terms defining the rights from which the measure of water can be calculated, would be important, and might be controlling. But while usage is admissible to explain what is doubtful, it cannot be permitted to contradict what is plain. *Cummings* v. *Blanchard*, 67 N. H. 268. And unless the use has developed into a prescriptive right, it cannot be employed to defeat rights which are definitely granted and are capable of calculation. Here the tannery right is fixed as to area of ventage. The element left uncertain is the head which the deed implied, and that is susceptible of proof. The extent of the grist mill right is easily ascertainable. And the woodshop right can be calculated, when the flow of the stream is ascertained, and the tannery right, as it was in 1879, deducted.

Whatever the actual relative use of the water may have been, it is sufficient to say, without analyzing the evidence, that there is no evidence showing that any prescriptive right on the part of the users has been acquired. Until 1902 there seems to have been little or no trouble or complaint. As already said, any party had a right to use any or all of the stream which other parties did not require. The exercise of such a right, however long continued, does not give rise to a prescription. Unless such use of water is in excess of right, unless it is continuous for twenty years, unless it is adverse, and unless it is shown to have occasioned actionable injury, no prescription arises. *Crosby* v. *Bessey*, 49 Maine, 539. "Where a proprietor of land upon the shore appropriates and applies to his individual use so much of the passing water as he is enabled to do, even if it be the whole of it, by means of obstructions erected upon and within the limits of his own estate, and the proprietor of the land on the opposite shore neither uses nor seeks to use, nor makes any provision nor has any occasion for the use of any part of the stream or proportion of the water to which he is entitled, there is nothing adverse in the action of the former." *Pratt* v. *Lamson*, 2 All. 280. So as to any disproportionate use. In this case there is no evidence that any of the parties, except in rare instances, used any of the water that any other party at the time wanted to use.

In this case, for determining the rights of the parties, since they are all subject to the rights of riparian proprietors below, it will be

proper to say a word additional upon the right of detention of water, as applied to the conditions which exist. The defendant controls the dam. The dam not only holds the flowing water in a stream, but ponds it back over the area of a large pond over four square miles in area. If the water in the dam is permitted to get below the proper head, it is evident, as it is indeed admitted, a long time may elapse before the pond fills and the head is restored. The case is therefore different from the usual one of a pond in a river, which quickly fills after being lowered,—the filling by night, as is often the case, supplying the exhaustion occasioned by the use the day before. "Reasonable use is the touchstone for determining the rights of the respective parties." *Lancey* v. *Clifford*, 54 Maine, 487. "The reasonableness of the detention of running water by dams by the riparian proprietor above to the injury of the riparian proprietor below, depends much upon the nature and size of the stream as well as the use to which it is subservient." *Davis* v. *Getchell*, 50 Maine, 602. A use of water, followed by detention which would be reasonable in a pond that would fill in a night time, would not be reasonable in a case where it would take weeks or months to fill the pond. The owner of the dam controlling the water must not only see existing conditions, but he must foresee probable consequences. He must not either by use or sluicing, lower the water in the dam, so that in order to perform his duty to those below, and give them the natural flow at all times, he must deprive the grantees on his own dam of the water to which they are entitled. He must keep up the head so that they can exercise their rights and then the surplus of water, either natural or accumulated, which they are not entitled to, or do not use, he may use or turn down stream.

Nor is the situation materially changed by the fact that the defendant is a public service corporation, and charged with the performance of public duties, and that those duties can be more conveniently performed by having the flow of water in the stream kept constant. While it is true that the reasonableness of a use must be determined in the light of all other existing rights in the stream, and the upper right must not be unreasonably used to the prejudice of a lower right, yet it is also true that the plaintiffs have a right to use their

grants for operating a grist mill and a woolen mill, and for pumping water, and to use them in the usual manner, returning the water to the stream without unnecessary loss or detention. The proprietors below must take the water as it comes, after such a use, even if the flow is less constant and less valuable than it would otherwise be.

A question is raised as to the number of hours in a day the plaintiffs are entitled to use their grants. The answer is found, we think, in *Carleton Mills Co.* v. *Silver*, 82 Maine, 215, where this court held that the grantees under a grant similar to these had the right to run their factory by the water power granted as many hours a day as they considered proper.

The bill prays for an injunction. As the case has come up on report, this court is authorized to determine all issues raised by the bill and answer. We have determined the construction to be placed upon the grants under which the plaintiffs hold. But we think the case is not yet ripe for further decision. And although ordinarily we should proceed to a decision upon such evidence as the parties have thought fit to offer, we are the more willing to depart from that practice in this instance, not only because there is a lack of essential evidence, but more particularly because it is obvious that the parties can now, after construction, direct their proof to the pivotal points of the controversy. And we think it is just that they be permitted to do so.

The first question to be settled relates to the head of water. We have held that the grants called for the maintenance of a head at the usual height at the time the grants were made. That may have been at the crest of the dam, and at some times in the season it may have been lower. It is not denied that the present wheels of the plaintiffs, which they claim use no more water than they are entitled to use, can be run efficiently with the water at least one foot lower than the crest. Whether the dam was usually kept full, or was usually drawn down somewhat in the dryer seasons of the year, so as to use the supply in the pond, does not appear. It should be made to appear. Again, before the plaintiffs can obtain an injunction, it must satisfactorily appear that the lowering of the water in the pond was not due to their own use of water in excess of their rights. If both

parties have exceeded their rights substantially, we think an injunction ought not to be awarded to one against the other; and that having learned their rights, it will be presumed that they will not hereafter overstep them. The plaintiffs have not yet shown that in the use of the water under the tannery and wood shop grants they have clearly acted within their rights. Under the one they are entitled to the use of five hundred square inches, under the other to six square feet, or nine square feet when the water runs over the dam, but not exceeding the quantity granted in 1849, both under the usual head at the time of the grants. These are fixed amounts and are susceptible of measurement. There is no satisfactory evidence offered by the plaintiff as to the amounts used by the present wheels. Their capacity for use of water was not determined, so it appears, with reference to the amount of water conveyed by the grants, but with reference to the capacity of the wheels which were there before. That is not sufficient. Though the defendant has offered evidence touching the draft of the plaintiffs' wheels, still it is not shown whether that is, or not, in excess of the plaintiffs' limited rights. Before a definitive decree can well be framed, even for the partition of the water, all these facts should be ascertained, and it will be for the interest of all parties that the rights of the plaintiffs should be expressed in cubic feet per second.

The cause will therefore be remanded below, and there will be referred to a master who will, upon the present evidence and such other evidence as the parties may present, ascertain and report, in cubic feet per second, the quantity of water the plaintiffs are entitled to use under each of their grants, and under what head, as determined by him in accordance with the opinion. He will also ascertain and report in cubic feet per second, the quantity of water which the plaintiff woolen company's present wheels use under the ascertained head.

Upon the coming in of the master's report, a single justice will determine the questions of injunction and costs, and enter a final decree in accordance with the opinion.

As to damages, the court is of the opinion that the plaintiffs should be remitted to their remedy at law, where the parties may exercise their right to a trial by jury. We do not deny the jurisdiction of

a court in equity in appropriate cases to award damages as incidental
to an equitable remedy, in order that full justice may be done, or in
place of an equitable remedy prayed for, when the specific remedy
has become impracticable or would be futile.   1 Pomeroy Eq. Jur.
3rd Ed. sect. 237.   It is sufficient to say here that there is not only
a want of essential evidence, as already pointed out, as to how much
of the plaintiffs' injuries were due to the defendant's acts, but from
the character of the evidence of damage offered there is no way of
distinguishing between damages sustained before the bill was brought,
and those sustained afterwards.

> *Case remanded for further proceedings in accord-*
> *ance with the opinion.*